Good morning. We have four argued cases this morning. The first of these is number 151131, Pfizer Inc. v. Mylan Pharmaceuticals. Mr. Karsten. Good morning, Your Honor. May it please the court. I think I'd like to begin by identifying what it is the issue is on appeal and what's not being appealed. We're appealing the lower court judgment relating to the application of the Merck v. BioCraft case. We're not appealing the findings under Otsuka for the lead compound analysis. Under Otsuka, Pfizer's brief, for example, really does focus in on the lead compound aspects as opposed to addressing the actual issue on appeal, which is the Merck v. BioCraft case. We submit that in the chemical arts, there are multiple ways to prove obviousness. It's not limited to just a lead compound analysis. But even if that's true, it seems to me that you have real problems with Judge Sleet's findings, who found that it wasn't obvious to go from dimethylsunitinib to sunitinib and also found that it wasn't obvious to go from there to the salt. Those are the two factual findings that we believe Judge Sleet committed clear error. The remainder of the factual findings, many of which Pfizer amplifies and relies heavily upon in its brief, are not relevant to this appeal. With respect to the dimethyl to diethyl conversion, one need look no further than the four corners of the 422 patent. Now, under the Merck analysis, you've got a combination, aldehydes and oxindols, about 1,200 possible combinations to generate a structure of formula one. But your problem, same problem, is that the district court found certain expert testimony persuasive, that the procedure would not have replaced the dimethylene group with a diethylalamine group if faced with a decalation problem. Yes, Your Honor. So when one gets to the dimethyl compound from that group of 1,200, we submit its routine experimentation to go from the dimethyl to the diethyl. And the reason is found in the 422 patent. But you're challenging his fact findings there, right? And we admit it. But he believed an expert who said otherwise. Well, the expert in question said that conversion to the diethyl may not solve the dealkylation problem. But that doesn't change that there may well be a reasonable expectation of success. And that's what we're talking about with respect to obviousness here. So the 422 patent application itself says that of the alkyl groups, of which methyl is one, that most preferred are a group of C1 through C4, the so-called lower alkyl. And that is found within the four corners of the 422 application, A3075 lines 1 through 2. A person of ordinary skill in the art expects or understands, and there's testimony exactly to this effect, that dealkylation may well be a problem. And it's routine experimentation to see what the patent application itself teaches in terms of determining a possible or a potential solution to the problem that, while it may not work, there is unpredictability in the art. We recognize that. And that's what Judge Sleet was talking about. That doesn't change the fact that there could well be, and there was in this case, testimony about an expectation of success based within the four corners of the 422 application itself. And that's why we submit that Merck applies. And in fact, Judge Sleet's legal test under the Merck analysis really amounts to about two lines in the opinion. And we believe that the legal test as applied by Judge Sleet was tainted with the Otsuka lead compound analysis. Otsuka itself says and recognizes that new compounds may be created from theoretical considerations rather than from attempts to improve on prior art compounds. It doesn't require. There's a separate obviousness line when you're dealing not with synthesized and studied and disclosed information about prior art compounds. When you're doing that, then Otsuka says ordinarily you use a lead compound analysis. We submit that Merck itself remains good law. And the more time that one spends with the prior art 813 patent that invalidated the patent that was at issue in Merck, the more one recognizes how close and similar this case is to the Merck case. When one looks at the Merck decision, for example, and one reads Judge Bissell's dissent, that dissent could well have been written, Your Honors, about Judge Sleet's opinion here. But that didn't alter the fact that this court found the patent at issue in Merck obvious. Just as we submit here, the one single four corners reference, this near miss anticipation, should render the asserted patents and the claims that Pfizer asserted against Myelin here obvious. And Judge Dyke, with respect to the salt selection, we submit that the district court committed clear error in finding the salt selection not to be routine. This court, 10 years ago, nine years ago, excuse me, in Pfizer versus Apotex, considered the nature of salt selection process and found, in the connection with amlodipine basalate, in the Pfizer versus Apotex case, that the screening of salts was simply routine. And that was based on work done in 1986. I submit that something that was routine back in 1986 did not become unroutine when conducted in the late 90s. It was the same issue. Moreover, Pfizer spends a fair bit of time. Well, let me back up for just a moment. There's a clear error of fact also in Judge Sleet's opinion with respect to salt selection. Judge Sleet says that there is, at page A22 in the record, here, unlike in Pfizer, there was nothing in the prior art to suggest to one skilled in the art that malate was one of a limited subset of salts to choose. The Burge article that formed the basis and was relied upon heavily in the previous Pfizer amlodipine case cited a Burge article for the proposition that basalate was known in the art to the tune of, I think it was about 0.25% of the available salts, pharmaceutically acceptable FDA-approved salts. Here, that very same article put into evidence at A9219 of the record, identifies malate as a salt in 0.13. The district court erred when it discounted and did not cite to that evidence and found instead that there was no evidence submitted. There absolutely was. Moreover, with respect to the 422 application, if you look at the four corners of that document, it fits like a glove with the Merck analysis. You've got a list of compound structure 2's, aldehydes, and a list of structure 3's, oxindols, that come together into 1,200 combinations, approximately. That dimethyl compound, one of those 1,200, is called a compound within the scope of the invention at A3086, 22 to 23.  Saying that compounds that are within the scope of the invention are expected to be suitable for treating cancer through this anti-angiogenesis mechanism or through protein kinase inhibition. Let me understand your argument. Is your view that any time you have just an application which has a very broad theory and very general look of you can combine this class of substances with this class of substances to reach an abundance of compounds that will treat cancer, that that, as a matter of law, renders any of the numerous combinations in there obvious? Your Honor, I would change that a bit. I don't think it's quite as broad as Your Honor is suggesting, Judge Hughes. I think that when there are multiple tests for proving obviousness, and when there is this combination set up, where the piece of prior art in its four corners says, you take one of these and you combine it with one of these, and then through routine experimentation you get to something that is later patented, and that previous bit of art comes from the same patentee, then yes, when it's a discrete, finite number of combinations, then absolutely I agree that as a matter of law that those 1,200 odd combinations are obviating references over a later patent by the same patentee. That's exactly the situation we have here. That's exactly the situation that we had in Merck, and Merck remains good law. I know the reference doesn't specifically mention this specific combination or this specific compound. It does not mention this specific final compound. But again, we're one of 1,200 at pages A3086 through 3088, and A3088 through A3090. But later, in the same disclosure, there are examples of problem here, if we take your argument to its logical extreme. I mean, isn't it going to be that if some scientist decides, here's this exciting new theory I have for cancer treatment, and I've discovered that if you combine these two different classes, they do all this kind of things, there are hundreds of thousands of combinations. I don't have the resources to try these out. I'm going to publish an academic article in this, because I want to encourage progress. And people go out and do the research and patent a new revolutionary drug, and somebody comes back and says, well, this has already been mentioned 10 years ago in this scientific article that's prior art. Isn't that going to inhibit scientific research into these type of drugs? I don't believe it will, and I don't believe that in that circumstance, so long as the person who does the publication, that scientist, is not the subsequent patentee. What's the difference there? I mean, the prior art, it doesn't matter if the prior art comes from the same company or the same scientist or not. It's still prior art. Well, it is still prior art. But under the Otsuka lead compound analysis framework, the patentee himself, if we're limited to just a lead compound analysis for chemical compound patents, then the patentee, him or herself, has control over what is prior art for obviousness under 103. So if this, instead of a application by the same company, had instead been a researcher publishing in an academic journal, would you then say it's not prior art? I would say that there's still an argument under Merck, but it's not the same case that we're presented with here. What's the legal basis for that distinction? Well, the Merck case itself was based on a Merck prior patent application, and then Merck later went ahead and patented a combination. In Merck, did we say anything about why that makes any legal difference for an obvious analysis? The court didn't parse it that closely, as far as I can recall. However, the facts, the pertinent facts upon which the Merck court based it were the fact that it was a Merck single reference patent, single reference obviousness challenge. Here, we have a Pfizer patent, two Pfizer patents that have been asserted against myelin, and we're arguing that a previous Pfizer progeny, it's the same company, the same entity, their patent application should be held against Pfizer. I think that there is a rationale for that. Now, I'm not suggesting that Merck be read so broadly as to encompass a disclosure of hundreds of thousands or millions of compounds. That's not the case that we're presented with here. Where do we draw that line? 1,200 is enough to make it obvious, but a million's not? That sounds to me like fact finding that's left to the district court, not a matter of law, which is what you're arguing today. I understand, Your Honor, but this court has already applied Merck to 1,200. I'm not asking for the court to- Based on those facts. And the district court here found different facts. If one reads the Merck district court opinion, the Merck district court opinion is very, very similar to the district court opinion that Judge Sleet rendered with respect to this case below. And the more time one spends with the 813 patent- But the problem is it's fact finding. I suspect if you had won here on the other side and tried to defend based upon a matter of law, you would have said, well, it's all fact finding. We can't review that. Well, you can review it under a clear error standard. You're making a legal argument about the application of Merck to obviousness. I'm not talking about the clear error portions. But I don't understand how- I'm sorry. I've taken you way over your time. You can just wrap up. Well, I'm actually out of time. And I've reserved the balance of my time for a vote. You don't have any balance. But we'll give you two minutes for a rebuttal. Thank you. Selby. Tom Selby from Williams and Connolly for the Appalese. May it please the court. After a bench trial, then-Chief Judge Sleet of the District of Delaware made factual findings, made credibility determinations, and found that the asserted claims of the 293 and 905 patents were not obvious. Judge Sleet's 25-page opinion is replete with factual findings. Replete with factual findings and conclusions of law in Appalese favor, almost none of which are challenged by Milan on appeal, and all of which are supported by ample evidence in the record. In particular, as we just heard, Milan doesn't challenge that under this court's bedrock lead compound analysis, this court should affirm the judgment below. The 422 compound was found not to be a lead compound. In fact, it was found to be the epitome of hindsight to assert that this hypothetical compound would be a lead. And that finding alone is determinative under this court's longstanding lead compound analysis. But even- Where do we draw the line here? If instead of however many combinations, I know you and your friend disagree about how many combinations, but instead of the multitude we have here, the application had said, here's a class of five drugs, combine them with another class of two drugs to get a promising cancer drug. And they don't go through and list every single combination. But that's a fairly limited universe. Isn't that per se obvious for a smaller universe? Judge Hughes, I think the answer to that was posed in your question to Mr. Carson, which is that is a matter for the district court to assess, given all of the evidence and the factual determinations and the witnesses and the credibility determinations in a particular case. And here we have a finding that it would not have been obvious- In that circumstance, right? You could have a circumstance where there was a discrete, limited, finite group of compounds where, under KSR, if there were predictable results from that limited, discrete set of compounds, that you could arrive at the claimed compound. That's not the case here. And there are no factual findings to support that. In fact, the district court found to the contrary, that it would not have been- claim compounds, even starting from the hypothetical dimethyl compound. And in this case, that is critical. Even if you take up Mylan's assertion that Merck has some watered-down version of the obviousness test, and it does not, and this court has certainly never applied Merck in that way, this court should still affirm the judgment without hesitation. Because even under Mylan's proposed test, the factual findings that have already been pointed out by the court here are dispositive and lead to affirmance. First, even starting from the precursors that have been selected by Mylan, and this act alone would require ignoring all of the prior art teaching away from the particular features of those precursors. But even starting from those precursors, it does not lead to the claimed compound. And the district court found, Judge Dyck, as I think you pointed out, that there would be no motivation to modify, starting from the hypothetical dimethyl compound, no motivation to modify to arrive at the claimed compounds. The district court found at page 12 of the record that it would not be routine optimization, which is a critical step. And Judge Hughes, you had asked a question about whether any one of the numerous compounds would be obvious. And my colleague responded, no, you need routine experimentation to get there. But in this case, we have a specific factual finding from Judge Sleet at page A12 that there would not have been, that this would not be a matter of routine optimization. And it would have required significant guesswork and variation of parameters. And so if we had a situation in which there was a prior art patent on 1,000 combinations, then wouldn't we be in the genus species situation where, in order to say that the species was non-obvious, you'd have to show unexpected results? Well, a large genus is not going to render obvious every compound in that genus without some direction to get to the specific claimed compound here. And so I'm not sure that's true. I'm not sure that in that situation you don't have to show unexpected results in order to make the species separately patentable. I think it depends on the factual circumstances of the case. And here, of course, we do have extensive findings of unexpected properties. The compound here that was discovered, which, by the way, had features that the prior art taught would be detrimental to activity, was hundreds, up to 10,000 times more active than the prior art compounds. And there's no dispute about what compounds it should be compared to. And compared to those prior art compounds, it was up to 10,000 times more active. And so here, we're in a different universe than that situation, because we do have extensive findings of unexpected properties, another objective indicia of non-obviousness. Now, furthermore, as to the specific changes that would be required to get from this hypothetical compound to the claimed compound, again, the district court made specific factual findings that are supported by the evidence. The change of these two terminal methyl groups to ethyl groups was a non-obvious change, as found at A17 of the record. And in fact, the 422 application, while it's submitted that the 422 application teaches you by itself to get there, there are no diethyl compounds disclosed in the 422 application. And what the district court found is that the only motivation proposed by Mylan in this case, that you'd be concerned with dealkylation, where you metabolize that terminal dimethyl compound, would apply equally to diethyl, and would not motivate you to choose the diethyl, and in fact, would not give you an expectation that choosing the diethyl would solve the problem. And in fact, it would teach away, because you would want a cyclic ring, which in fact, is disclosed in the 422 compound. And so as the change in the terminal methyl to diethyl, the district court made specific factual findings that that would not have been obvious, and would not have been a matter of simply routine experimentation. Furthermore, the district court found that choosing the extraordinarily rare L-malate salt would not have been obvious to the person of ordinary skill in the art. And again, that's at A22 in the record. Now, one of the critical steps along the way here is, what is the motivation to modify? The district court found, and this is supported by the testimony of Dr. Stafford, that there would be no reason to choose any salt, that there was no motivation to select any salt. That finding is not challenged on appeal. The point was made that the Burge reference appeared in the Pfizer versus Apotex case, and also appears here. But what was not mentioned is that the salt, this very rare salt, the malate salt, was not on the list of salts in FDA-approved drugs as of the priority date. It had fallen out. It wasn't there. And at A23 in the record, Judge Sleep found that that was another reason that the salt would not be obvious. And that's supported at 2399 by Dr. Meyerson. So the salt itself would have been non-obvious, and there were specific factual findings on that. Now, even if you followed Mylan's chain and ignored all of these factual findings as to getting to the claimed compound, there would still be no reasonable expectation of success. Remember here, the hypothetical compound, that is the marriage of these two precursors, it had features that were disfavored in the art. There was no data analyzing it. It had never been synthesized or described. As Judge Sleep said, it was the epitome of hindsight to select it. And in fact, he found, at pages 17 and 18 of the record, that there was nothing to suggest that this particular combination would yield promising results. And so there would be no expectation that the starting point, this hypothetical compound, would have beneficial features, much less all of the alterations that would be required to get you to the claimed compound. And finally, as I pointed out, even if you accept the Merck analysis, the objective indicia here are extraordinarily compelling. But ultimately, and I'll just spend a moment on this and answer any questions, Merck does not support Mylan's analysis here. Merck has never been applied to test the obviousness of a chemical compound in a pharmaceutical field, and for good reason. It invites impermissible hindsight. Merck is about co-administration of two known substances. You have two diuretics that have known properties, and you put them together, and the combination has the same properties as the two individually known compounds when you combine them. That is miles away from the facts here, where you have two completely unknown precursors, which have no properties that are described in the art whatsoever. And you put them together. That doesn't provide you with any expectation that the compound is going to have beneficial features. And in fact, as I said, they had features that were disfavored. And so Merck simply does not stretch as far as Mylan would like. And that's why this court has rejected the prior attempts to import that case into the chemical obviousness context in both the Otsuka and Lilly cases cited at page 43 in our brief. Judge Sleet heard all the evidence. He heard the witnesses. As you see in his long opinion, he made factual findings and credibility determinations throughout this case. He supported his opinion with a lengthy set of findings of fact that are supported by the evidence. And we submit that affirmance is the proper result here. Glad to answer any other questions. Great. Thank you, Mr. Silbey. Your Honor, just very, very briefly, Mr. Silbey mentioned there was thousands of times activity of sunitinib as opposed to prior art compounds. He said that was a factual finding. I didn't see that factual finding in the record by Judge Sleet. In fact, the fact is that predecessor compounds, such as those that below we had argued were suitable for lead compounds, were in clinical trials and had demonstrated efficacy for treating cancer through this antiangiogenesis pathway. So in terms of unexpected properties, there really were no unexpected properties. Sunitinib was just like the items that we had identified, prior art compounds we had identified as potential lead compounds for Judge Sleet's evaluation below. In terms of the issue about the cyclic compound, we believe that Judge Sleet committed a clear error there. Both experts, medicinal chemistry experts below, and this is in our opening brief at page 15, had said that even if you recognize dealkylation as a potential problem, among the issues or among the items that one would have been motivated to try was the diethylamine. And then there were a handful of other compounds, including cyclic compounds. We're not talking about thousands of options. Both experts said, yeah, there's five or six. And we've identified those in our opening brief at page 15. Finally, there's a suggestion that there was a later publication on the number of counterions that were identified as FDA approved. There was a subsequent to the Birch article, an Anderson article, in which malate had fallen off. OK, that doesn't really mean all that much. And certainly, around the time of the priority date, the very patentees here were publicizing the fact they were using malate as a counterion for another product, salt. And that's at A9451. Unless the panel has any further questions. Thank you, Mr. Parsons. Thank you. Thank both counsel, the case is submitted.